(No. 30665.—

Sanford Tyler *et al.*, Appellees, *vs.* John Tyler, Exr., *et al.*, Appellants.

*Opinion filed November 18, 1948.*

436

J. L. McLaughlin, and James M. McLaughlin, both of Sullivan, for appellants.

Herrick & Rudasill, of Clinton, for appellees.

Mr. Justice Thompson delivered the opinion of the court:

By this direct appeal review is sought of a decree of the circuit court of De Witt County, setting aside the purported will of one Timothy Tyler upon the ground of mental incapacity. A freehold is involved which gives this court jurisdiction on direct appeal. The complaint filed to contest the will charged mental incapacity, undue influence and forgery. The cause was heard by the court without a jury and, after hearing the evidence of the respective parties, the court found that the testator, at the time of the execution of the said will, was not of sound mind and memory and was not mentally competent to execute a valid will.

The errors complained of are: First, that the trial court erred in its ruling on the admission and rejection of certain evidence; second, that the trial court erred in its application of certain rules of law to the evidence; and,

third, the trial court erred in holding that there was sufficient competent evidence in the record upon which to base a finding that the testator, Timothy Tyler, was not of sound mind and memory at the time of the execution of his last will and testament.

The evidence discloses that Timothy Tyler, aged eighty-five, died on April 10, 1947, in the John Warner Hospital at Clinton, leaving an instrument executed on April 5, 1947, purporting to be his last will, by which all of the decedent's estate was given to his brother, John Tyler. This instrument was duly admitted to probate in De Witt County on May 16, 1947.

The deceased was the owner of 40 acres of land upon which he and his brother John had made their home together for a number of years prior to his death. He had suffered a broken hip in 1941 and thereafter was compelled to use a wheel chair and was confined to his home. There was evidence that he was nearly blind and awkward in his speech and that at one time there had been a petition filed to appoint a conservator for him. When admitted to the hospital on April 3, 1947, he was acutely and seriously ill. He had a severe vascular congestion in his lungs, and was also suffering from myocarditis, a degenerating process of the muscles of the heart, and from arteriosclerosis, or hardening of the arteries.

A number of witnesses testified that in their opinion the decedent was of sound mind and memory prior to the time he was taken to the hospital on April 3, but the evidence is conflicting as to his mental condition while he was in the hospital and at the time he executed the will. The only witnesses who saw him during the time he was in the hospital prior to his death were three doctors, three nurses, a neighbor who visited him on April 6, and the attorney who prepared and witnessed the will.

Dr. C. S. Bogardus, who had treated him in 1941 for his broken hip, but who was not his attending physician at

any time during his last illness, testified that he saw and spoke to him sometime prior to April 6. This witness gave as his opinion that he was of unsound mind, his opinion being based upon decedent's manner of answering and the witness's observation of him at that time.

Dr. Bernard M. Pugh, who was the attending physician from April 3 to 6, testified he was "mentally confused," but stated he could not express a definite opinion concerning the extent to which he was mentally incompetent. Dr. Kring, who had charge of him from April 6 until his death, described the nature of the disease from which he was suffering and stated that he was then in his dotage. Mabel Sudendorf, the hospital superintendent, testified that in her opinion he was of unsound mind, but as she based her opinion entirely upon the reports of the nurses under her supervision, her testimony was stricken by the court. Jane Johnson, the nurse on duty from 7:00 in the morning until 3:00 in the afternoon, testified that she had known Timothy Tyler for years, and that from his conversation and actions while he was in the hospital, she was of the opinion he was not a sane man. Juanita McAdoo, the nurse on duty from 3:00 in the afternoon until 11:00 at night, testified on behalf of the proponents of the will that there was nothing wrong with him mentally. However, she admitted she had previously told the attorney for the contestants, when questioned about decedent's mental condition, that she did not think that decedent knew what it was all about. M. J. Hallahan, a neighbor of Timothy's, who had been acquainted with him for more than thirty years and who visited him at the hospital the day after the will was signed, was of the opinion that he was then of unsound mind.

John F. Pearl, the attorney who prepared the will and witnessed its execution, testified that in his opinion Timothy Tyler was of sound mind and memory at the time of the execution of the will; that about a month before Timothy

was taken to the hospital, he had a conversation with him about the disposition of his estate; that someone had stopped at the witness's office and left word for him to go out to Timothy's home, which he did, and that Timothy told him that he wanted to give John everything that he had, that they discussed making a will or a deed, and Timothy was to come to the office to sign; that he did not see Timothy after that until Saturday morning, April 5, when he happened to go to the hospital to see someone else; that Timothy asked him if he had made up the papers they had talked about, and when informed by Pearl that he had not, told him to make up the deed and the will and bring them out for him to sign. The attorney further testified that after receiving these directions, he went back to his office and called his stenographer, who was off duty because it was Saturday afternoon and she came and wrote the will and deed, which he took out to the hospital about 3:00 o'clock that afternoon; that he read both the will and the deed to Timothy and asked him, as to each one, if it was the way he wanted it, and that Timothy, in each instance, said that it was; that he then called the taxi driver who had driven him to the hospital and the two of them witnessed the execution of the will. The attorney further testified that John Tyler never asked him to make a will for Timothy, that he never asked him to talk to Timothy, and that John did not come to his office and was not there any time on Saturday morning, April 5, 1947.

Noden Bowling testified, however, that she was the stenographer employed by attorney Pearl on April 5, 1947, and that on the morning of that day John Tyler came into the office and said he wanted some papers fixed; that he and Pearl went into the private office and after that, the attorney called her and dictated the will here in question.

The credibility of Pearl's testimony is also affected by the fact that John Tyler, when testifying as an adverse witness, admitted he was in the attorney's office when the

will was drawn, and by the further fact that the nurse in charge of the floor on April 5, until 3:00 in the afternoon, testified that she did not see the attorney there at any time while she was on duty and did not believe he could have been there and she not see him. Furthermore, attorney Pearl's testimony that Timothy had previously directed him to prepare a will and deed giving his property to John, and was to come into the office to sign the same, was at variance with evidence in the record that Timothy had never left the farm after he fractured his hip and with Pearl's own admission that he did not think Timothy had been off the place for over a year before he went to the hospital.

It is appellants' contention that the court erroneously struck out a portion of the testimony of Dr. Kring and they also complain that the witnesses, Dr. Bogardus, Jane Johnson, M. J. Hallahan and Ira Tuggle were permitted to testify that in their opinion the decedent was not mentally competent, without such witnesses testifying to sufficient facts to render them competent to give an opinion as to the mental condition of the deceased. The answer of Dr. Kring was a reply in narrative form to a question to which he was told to answer yes or no and which question required a yes-or-no answer. The answer given not being responsive to the question, the court committed no error in striking it from the record.

It is contended the witnesses did not testify to sufficient facts to render them competent to give an opinion as to the mental condition of the deceased. No rule can be laid down which can in any given case determine how much evidence is necessary to lay the foundation for nonexpert opinion evidence in cases of this character. (*Catt* v. *Robins*, 305 Ill. 76.) Opinions of lay witnesses as to the competency of the testator in a will contest are admissible when they show opportunities for observation and state sufficient facts upon which to base such opinion. (*Peters* v. *Peters*, 376 Ill. 237.) The rule is that a person who is not an

expert may give his opinion concerning the mental capacity of a testator if it appears that such witness has an acquaintance with the person whose competency is in question and relates facts and circumstances which afford reasonable ground for determining the soundness or unsoundness of mind of such person, and that the value of the opinion so expressed is such as the capacity, intelligence and observation of the witness who forms it may warrant. (*Ergang* v. *Anderson,* 378 Ill. 312.) While physicians are better qualified to testify to a diseased condition than are laymen, their testimony upon the subject of the mental capacity of an individual whom they have been privileged to observe is not entitled to any greater weight than that of laymen. (*Nadenik* v. *Nadenik,* 372 Ill. 408.) This court, in cases where the issue as to the testator's mental competency was submitted to a jury, has often stated that the question whether the facts narrated by a witness form a sufficient basis for the opinion of the witness is one for the trial court to determine and that, unless such court abuses its discretion, the admission of an opinion not based upon sufficient knowledge will not effect a reversal of the decree. *Ergang* v. *Anderson,* 378 Ill. 312; *Down* v. *Comstock,* 318 Ill. 445; *Catt* v. *Robins,* 305 Ill. 76.

The issues in the present case were tried, however, by the court and not by a jury. The court was therefore the judge not only of the admissibility of the evidence but of the weight to be attached thereto. We have carefully considered all the testimony of the witnesses objected to, together with the rulings of the court upon the admissibility thereof, and are convinced that the court committed no error in this respect.

Appellant further contends that the court misapprehended certain portions of the evidence and also erroneously gave great weight to the fact that one of the subscribing witnesses to the will was not called by appellees to testify as to the mental competency of the deceased. This is based

442

on certain statements contained in the written opinion of the trial judge, made and filed by him in the case. However, it is the decree and not the statements of the chancellor which is before us for review. The decree entered vacated and set aside the purported will and the probate thereof and contained a finding that the deceased, Timothy Tyler, was not of sound mind and memory and mentally competent to execute a valid will on the date of its execution. If the law and the facts, as presented by the record, justify this finding, then this court, as a court of review, will sustain the decree, regardless of the reasons which influenced the lower court in arriving at its conclusion. In chancery cases the whole record, including all evidence, is before this court, and if there is competent evidence sufficient to sustain the decree it must be affirmed; if not, it must be reversed. (*Newman* v. *Youngblood,* 394 Ill. 617.) The finding of the court below as to the testamentary incapacity of the deceased is amply supported by the competent evidence in the record here, and this court would not be warranted in reversing its decree.

For the reasons pointed out, the decree of the circuit court of DeWitt County is affirmed.

*Decree affirmed.*